The next case will be 06-1187 Sandisk v. ITC Good morning and may it please the Court. Sandisk has challenged the Administrative Law Judge's findings on five broad grounds. ST responds to those arguments that we've made and stresses the standard of review and stresses the fact that we have a tall mountain to climb because there are so many issues that we have to prevail on. I have the following responses to that. First of all, the standard of review that ST and the ITC are focusing on is not the standard of review on this appeal. We are not challenging any fact findings of the Administrative Law Judge. All the issues that we are raising are legal issues. They're either claim construction issues or they're methodology issues. Secondly, while we are raising a number of questions, five different questions, the ALJ's findings are very vulnerable, not just because I'm telling you that, but if you read the briefs, you will see that ST notes six different errors in footnote 1 and footnote 12 of its brief that the ALJ made. The ALJ's findings are inconsistent with five separate findings in the Samsung case, which involve products materially not distinguishable from the products in this case, and the legal issues in the Samsung case were very close to the issues here. I'm not suggesting that the Court should just rubber stamp what we are arguing before the Court merely because of these points. I'm merely saying that the tall mountain that ST is placing before us is not as tall as they are suggesting. But, Mr. Dunner, if you lose on any one of the issues, you lose. Is that correct? You have to win on all five? That is not quite accurate, Your Honor, for this reason. One is, on the means for verifying issues, one of the issues is a binary versus multistate flash EPROM. Every device of ST, except one, is a binary, and so even if we lose on that issue, we would win on every one but one product. Secondly, the means for inhibiting issue basically doesn't have any separate findings. It's tied into the other findings. So what reduces itself is four issues. Yes, we have to win on those four issues to the extent your question gets an affirmative answer. Time doesn't permit me to go into all these issues, but let me give you samples of why I feel we should win in this case. Let's talk about the temporarily storing means, which is the first means involved. It is clear, if you look at page 86 of the appendix, you will see the findings of the Administrative Law Judge support the notion that, at least in the erase mode, there are two modes here. One is the erase mode, and one is the already programmed mode. In the erase mode, there would be infringement but for two points made by the Administrative Law Judge. One is, the Administrative Law Judge says, there's no requirement in the claims that it be restricted to the erase mode. Well, the law doesn't require that there be a requirement. The question is, is the claim generic to these two different modes? I submit it is, and if it is, the case law makes it clear that either one of these modes, if satisfied by the accused product, would result in infringement. Secondly, the Administrative Law Judge and ST and the ITC staff make a point of the fact that ST's product uses what is called status information, rather than what is called data programming information. I submit again, the case law makes it clear that the name you give to what is going on is not important. The question is, what is going on? What is going on here is that the data stored in the latches is identical to the target program data in every case, without exception, in the erase mode. Therefore, the fact that one is called status and one is called data programming information is really irrelevant. Let me ask you about that. I'm a little nervous because some of the material here is confidential, so I'll rely on you to stop me immediately if I start saying something I shouldn't be saying. Do you disagree? As I understood what the AJ said, he says that it has to store actual data to be programmed in the particular cells. And that's one of the bases, at least, for his saying that there is no infringement here. He said essentially that. Is that wrong? No, but we have, what we have, we have, this involves a logical system. There's ones and there's zeros. And you probably recall the touch me, don't touch me. If there's a zero, it means touch me. If there's a one, it means don't touch me. When you have a zero, that means touch me. And what will happen is that you will get the number, you will get the ultimate number in the erase mode that's in the, it's actually data. One is data, whether you call it a status number or not. It is actually data, and it's data in both cases. But it's not data, is it, that's to be programmed into the cell? It is. The end result is that you get exactly, if you have, in the erase mode you have ones in each, in the cells. And if you want to change that to a zero, you put a zero in the latch, in the stored data. And you end up with a zero. So you will end up, and the zero is data, and you end up with a zero, which is data. So I submit that what is done in the claim, in the patent, what is done in ST is exactly the same. In each case, you're using data. In one case, you're calling it a status flag, which is what they call it. But the end result, what is being done, is exactly the same. And Your Honor, I suggest you look at A270. A270, column 19, line 57, to column 20, line 16. There's an embodiment there that works exactly like the ST product. You end up changing it. It's effectively a touch-me-don't-touch-me, effectively. You will end up with exactly the same thing. So I submit that whatever you call it, the end result is the same. Now, he also held on the temporary storing point that, in fact, the corresponding structure includes a shift register in addition to a latches. I submit that he was wrong, and it's clear why he went in that direction. There's a box in Figure 5, and it's box 190. And it's titled, Read Program Latches and Shift Registers. So every time reference was made to that box, they used the full title. But if you look at the patent in column, again, on page 270, column 19, line 65 to 66, the patent says, Parallel data is latched into latches. When they actually talked about what was happening, latched means stored. It's stored in latches, and every expert, not only ST's expert, but Sandisk's expert, all of them said that latches store and the shift register is used to convert data from serial to parallel format. But in what you've just quoted under the spec in column 19, the lines just preceding that, like 51 and 52, specifically refer to latches and shift registers. And that's not the only place in the spec where it references both latches and shift registers. I think it's right above. Your Honor, when the patent is talking about latches and shift register, it's always talking about this Figure 5 embodiment. Because in one box, one box has two separate functions. And the box is box 190 in Figure 5, and the experts have agreed that you actually, latches store and shift registers shift from serial to parallel. And whenever we have argued, whenever we have used the phrase in earlier statements that we made in the case, we always use the combination. We never argued that shift, never once did we argue that shift registers alone store. Never once. We always use the combination. And the patent uses the combination on a number of occasions. And it's using the combination to refer to that box 190, which has two separate functions. So it is not saying that shift registers store, because they don't. And the experts, if you look at the expert testimony cited in our brief, you see that they basically agree with that proposition. Now we go on to the means for programming in parallel. And the ALJ held that the corresponding structure was a source multiplexer, a drain multiplexer, and a program circuit with inhibit. Now the ALJ, we submit, committed three legal errors, all of them related. First of all, instead of looking at the way those two multiplexers and the program circuit with inhibit function, what he did was, he focused on the way electrons flow within the memory cells. He was not focusing on the right subject matter when he was looking for corresponding structure. The Samsung case dealt exactly with this question and pointed out that, in fact, on page 42 of the blue brief, there's a quote from the Samsung case where they point out that when you're looking at the way the electrons flow, you're looking at what is called HEI, hot electron injection versus Fowler-Nordheim tunneling. That is not the structure that you should be looking at. And the Samsung case correctly noted that that is not the structure you should be looking at. And moreover, that structure has nothing to do with the claimed invention. The ALJ found that the claimed function doesn't require either HEI or FNT. He said a person of ordinary skill in the art was aware of both. They were considered interchangeable. And all the details that ST and the ITC rely on, the voltage details, are all a direct consequence of whether you use HEI or FNT, which had nothing to do with the claimed invention. So how did the AJ go astray here? I'm sorry. I'm sorry. I just had a question regarding the difference between HET and FNT. Is there a difference? Yes, there are differences. What are the differences? The differences are spelled out in the briefs of ST. They relate to where the voltages are applied and various other matters dealing with the voltages. But that has nothing to do… But isn't it true that in NOR technology, the HET is used for programming and the FNT is used for erasing? That's exactly right. The accused technology uses NAND technology and the patented technology uses NOR technology, but that's a direct function of whether you use HEI or FNT. All I'm saying is this patent is not about HEI or FNT. The words HEI and FNT are not mentioned once in the patent. Those two are interchangeable. Sure, they're different, but that doesn't have anything to do with the corresponding structure, which is the two multiplexers and the last one, Kogom circuit with inhibit. I see I am running almost out of time. Did you have a question? No, that's okay. Okay. Thank you very much. Thank you. Good morning. May it please the Court. Substantial evidence in the record exists to affirm all the Commission's determinations in this case. Approximately 10 factual findings, plus there are two claim constructions made by the Commission that stand as challenges. Affirmance by the Court on any one of these Commission decisions will result in no violation of Section 337 of the Estes and NAND products. Particularly, the Court can affirm on one of these points. The Commission's construction of means for temporarily storing, the Commission's determination of non-infringement of means for programming in parallel, or the Commission's construction of means for verifying. Firstly, regarding the Commission properly determining non-infringement of means for temporarily storing, the Commission correctly construed this clause by finding that the 338 patent expressly links SHIP registers and latches 190 to the claim function. Further, it was undisputed by Sandus that the claim function refers to storing program data, as ALJ adopted the exact claim construction that Sandus asserted, and ALJ properly determined the Estes and NAND products. Can I ask you, before we run out of time, can I ask you just about the last point that Mr. Dunner was talking about in terms of the electrons, the FNT and the HEI. It doesn't matter, does it, whether FNT or HEI is used? Again, it is a critical feature preferred with the NOR architecture disclosed in the patent, along with the disclosed programming structure to use HEI with the NOR architecture and what's used by the Estes NAND product is different from that. But what you said isn't what the spec or anything in the patent says that, right? I mean, the preferred way is HEI versus FNT or vice versa. No, the patent doesn't specifically refer to HEI or an Estes programming method, but it does mention specifically regarding the critical feature of the programming structure, the programming circuit within HIPAA, along with the source string multiplexers. It's a critical feature of the patent to prevent the prior problem of over-programming, under-programming, and that's enabled by the critical programming structure of the programming circuit within HIPAA, along with the source string multiplexers. Particularly, it says, quote, in the specification at appendix page 270, columns 19, lines 10 through 20, parallel program is implemented by selected programming circuit, e.g., the source string multiplexers, and program circuit within HIPAA, which disables programming of those cells in the chunk and states what are being verified correctly. So it's a critical feature to have this individual control in each programming multiplexer, the source string multiplexers. Again, also— But does that have to be done with an HEI or an FNT? It's preferred to use with HEI with NOR architecture. With the NOR architecture. Right. For programming, not for erasing. Right, for programming. I'm referring to this particular means-plus-function clause. Also, particularly in the specification, does the compressor disclose applying distinct voltages of a B source, 0 volts, or a B drain, 8 volts, to the source string multiplexers, 107, 109. Again, you can find this at appendix page 261, if you use 19, or again, the corresponding express disclosure in the spec, appendix page 270, column 20, lines 48 through 63. Again, referring back to means for temporary storing, again, AHA properly determined that NAND products do not perform this recitic function. Further, with means for programming in parallel, disclosed programming instruction, again, critical programming technique for formula claim function, is substantially different from the programming structure. Technique of ST's NAND products, source string multiplexers, combined with the program circuit with inhibitor. Also, the commission properly determined, referring to the third means-plus-function clause, properly determined non-infringement of means for verifying if the commission correctly construed this clause, or finding 338-PAT expressly links current-sensing amplifiers to the claim function. Further, regarding infringement of temporary storing, again, it's undisputed that, again, the exact same thing as the instruction asserted by Sandus, which particularly was to be data for each of the progressed cells in chunks of the program, which is temporarily stored for a limited period of time, at least long enough to complete programming still. Again, it's established that the function of temporary storing is temporarily stored program data. The substantial evidence in the record supports ALJ's determination that ST's products do not perform this required function, temporarily storing a chunk of data for programming. In contrast, ST's product store data is not to be programmed. Also, the user of ST product can program a page of memory cells in the side layer that he or she wants to change if it's not page. Again, confirming that ST's land products do not perform this function of temporarily storing a chunk of data. Also, further regarding the programming in parallel, ALJ found substantial evidence in the record that supports determination that ST's products do not require identical or equivalent structure to perform the claimed function of programming in parallel. Initially, ALJ properly construed the corresponding structure, again, to be a 338 patent. And the 338 patent can be programmed to circle within HIBIT210, one of those multiplexer and drain multiplexers, which, again, is undisputed. Regarding infringement support by substantial evidence, the commission did not find an equivalent structure to the programmed multiplexers and programming circle within HIBIT and ST's products. In court, through case precedent, the stand is not established. The difference between ST's product structure and the disclosed structure is insubstantial. In other words, performing the claimed function stands in the same way to achieve substantially the same function. In particular, although ALJ did not find a 338 patent, it requires that the programming method, the disclosed programming structure, the programmed multiplexers 107 and 109, together with the programmed circle within HIBIT, corresponds, again, to a NOR, HEI, electron injection program. And so, again, we'd like to reiterate that the court only has to find one of these 12 commissioned determinations to affirm, one of the 12 to affirm, to find that ST's land products do not violate Section 337. And I want to leave time for the other responses. Thank you. Mr. Quarles? Yes, sir. Good morning, Your Honor. Together with James Dowd, I represent the intervene orders and the respondents below ST Microelectronics. Mr. Dunner commenced his argument by saying there weren't any factual issues involved here. We submit to you that the argument that you have just heard demonstrates exactly how factual the issues are and exactly how much they are issues of fact which were resolved against same disk on substantial evidence. Let's look at just two of the ones that we're talking about. The first is, does it store data? The second is, does it program in parallel? Mr. Dunner said that the HEI method of programming and the Fowler-Nordheim tunneling method of programming were interchanging. That, of course, is a question of fact, and it is also a question of fact that the administrative law judge resolved against same disk. He found, I believe, at page 97 of his initial determination, which the commission adopted, that they're not interchangeable. And they aren't interchangeable. These are two dramatically different methods of programming. And the patent tells us at column 20 that you must use, as illustrated in table 1 and 2, in order to program the N-cells, a voltage VPD must be applied to each of the N-cells drained and a voltage VPG applied to the control gates. So it tells you you're going to use the voltages that are in 18 and 19. It was unanimous as a matter of fact that those programming voltages could only be used for hot electron injection. And the patent tells you to use it. Now, someone asked, does it make a difference? There was substantial testimony. In fact, the administrative law judge goes from page 96 to page 112 of his initial determination, setting out some of the differences. For example, in a HEI method of programming, you have access to both the source and the drain of each cell. You can't have that in ST's products. You cannot individually access the source and drain of any cell because we don't have a source MUX. We don't have a drain MUX. The question was, are they different methods of programming? They're dramatically different methods of programming. What happens in hot electron injection is you put an 8 volts at the drain, 0 volts at the source. You have a layer of conduction that forms under the substrate. And as a result of impurities, between 0.001 and 0.1% of the electrons will be deflected to the floating gate. If you use NAND, instead of accelerating the electrons in the horizontal manner, they are accelerated in the vertical manner. As a result of that, 50% of all the moving electrons are put onto the floating gate. Does that make a difference in the real world? Of course. It means that you have orders of magnitude less energy consumed in hot electron injection than you do in Fowler-Nordheim tunneling. These are all things that the administrative law judge considered. And he said, I've looked at these, they're not equivalent. They're not interchangeable. They're two dramatically different ways to do it. ST microelectronics likes to do it one way. The patent requires a means plus function element that you do it in a different way. And I find there's no infringement. That was a question of fact, more than substantial evidence. Let's turn to the other element that Mr. Dunner talked about, which was the means for temporarily swirling. Once again, it's completely an issue of fact. Mr. Dunner says, well, when you start from the erase mode, well, there is no such thing as you start from the erase mode. ST microelectronics products can be programmed in either of two ways. You can program in the first instance with those that have been erased, but our literature, and the judge pointed this out, says you can program even things that have previously been programmed. If you do that, then you don't have anything like the logical coincidence that Mr. Dunner points to. The administrative law judge went through at length the portion of the testimony of Dr. Subramanian that is quoted in Sandisk's brief. And he said, well, they're not quoting it fairly. Dr. Subramanian said, if you start with something in the program state, it's clear that this is only status because you're not going to have a logical correlation at all. Because there aren't two different modes, what's in the QB latch has to always be the same thing in the QB latch. And what it always is, is an indication that you're going to touch me, don't touch me. Are you going to program, or are you not going to program? Question of fact, resolved against Sandisk, substantial evidence. Mr. Dunner says also, there's no time did we ever argue moving to the means for temporary storing structure. We never argued that the latches and shift registers were both required. Well, I tried the case. The first request for admission was, do you admit that the required structure is the latches and shift registers? And the answer was yes. That's in the record. If you look at A2849 and A2897, you'll see their pre-trial brief. And I quote, the latches of the ST micro and flash memory chips and the latches and shift register of the 338 patent perform the same temporary storage function, substantially the same way to achieve the same result. They were talking about latches and shift registers. And as Judge Prost accurately pointed out, the patent tells you that's where you store the data. You store the data in the latches and the shift register by passing it from a serial pin along the line and then programming in the patent the identical data into the memory cell. We never program the data that's in any latch into the cell. My time has expired. If there are any questions. Thank you very much. Let me start with the last point. I never said we never argued that the latches and the shift register provide the corresponding structure. I said we never argued that the shift register provided the corresponding structure. And when Mr. Quarles refers to 2849, he's doing exactly what I said. They're talking about figure five labeled and then their caps. Read program latches and shift registers. That was what was in the box. And as I pointed out, the patent itself, latches do the latching. When they talked about box 190, they combined them together. Mr. Quarles said there's no such thing as programming in the erased mode. Well, there is such a thing as programming in the erased mode. If you look at A270, starting column 19, line 57, through column 20, line 14, they basically are talking about dealing with the erased state, figure 51. And they describe the sequence exactly as it is used in the ST product. What did you mean, Mr. Dunner, when you started your first argument by saying there are no questions of fact? In this case, they're all questions of law. What did you mean by that? What I meant, Your Honor, was that we are not challenging questions of fact. We are challenging claim construction issues, which are a question of law. And we are challenging methodology used by the administrative law judge, so that when the administrative law judge said ST uses flags, whereas we use data, we say it's improper to do that. It's a matter of law, because the terminology involved is not proper terminology. We say that when he looked at HEI and FNT, he was looking at the wrong thing. We're not saying that there aren't differences with HEI and FNT. We're saying that they are irrelevant to the claim convention. And on page 42, which I just alluded to before, in the Samsung case, they explain exactly why HEI and FNT have nothing to do with the claim convention. Indeed, from the perspective of the patent and invention, there is no difference between programming using FNT and programming using HEI. All I'm saying is the questions of fact that Mr. Quarles is alluding to are not implicated in the issues that we're raising on appeal. We are not challenging his fact finding. We are challenging his methodology and his claim construction. That is what I meant. Doesn't the entire programming of a cell require the moving of electrons to the floating gate? Isn't that the essence of the whole operation, the gist? Is that it? No, Your Honor. It's not? Tell me what I'm wrong. It's involved. The way electrons moved are involved. But they do not relate to the claim invention. The ITC attorney basically said that the broad question involved here is how do you avoid over-programming and under-programming? Well, the way we avoid it for that particular feature is we use a source multiplexer. We use a drain multiplexer. And we use another structure with an inhibit in it. We're not focusing on what happens within those things with the electrons, which is exactly what the Samsung Administrative Law Judge held. We're focusing on the actual structure used. And you look, does that overall structure find an equivalent in the ST structure? And we say it does. Sure, if you look at a micro level and you go down to the details of what happens, how the electrons move, you will find the differences that Mr. Quarles referred to. But that's not what this invention is about. This invention is not an invention dealing with that kind of detail, which is exactly what the ALJ held in the Samsung case. Thank you. The case is submitted. The court will be in a brief recess.